Filed 8/19/21  P. v. Habibi CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B301123 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA072687) |
| v. | |
| HANNAH ANGELINA HABIBI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

Twenty-one-year-old Malik Lamont Holman was stopped at a red light when appellant Hannah Angelina Habibi, driving drunk at roughly 80 miles per hour, rammed into the rear of his vehicle without braking, killing Holman. Habibi was charged with second degree murder, on the theory that she acted with implied malice in driving while intoxicated -- a theory of murder colloquially referred to as "'*Watson* murder,'" after *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).[1]  (*People v. Munoz* (2019) 31 Cal.App.5th 143, 152 (*Munoz*).)  She also was charged with gross vehicular manslaughter while intoxicated, which requires only gross negligence, not malice.  During the jury's deliberations, the jury submitted several requests for clarification of the concept of implied malice, and one request for readback of a

---

[1]    In *Watson*, our Supreme Court reversed an order dismissing two counts of murder against a defendant who, as established at the preliminary hearing, had killed two people in a collision while driving drunk, holding that the defendant's conduct might support a finding of implied malice at trial. (*Watson*, *supra*, 30 Cal.3d at 293-295.)

medical examiner's testimony characterizing Holman's death as an accident (which was provided). In response to these requests, the trial court delivered several sets of supplemental instructions on implied malice, as well as supplemental instructions on causation. The jury convicted Habibi of both counts.

On appeal, conceding that she acted with gross negligence, Habibi does not challenge her conviction for gross vehicular manslaughter while intoxicated. She does challenge her murder conviction, contending: (1) there was no substantial evidence of malice; and (2) the trial court prejudicially erred in delivering various portions of its supplemental instructions, each of which allegedly (a) misled the jury with respect to the law of implied malice, or (b) infringed on the jury's functions. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Habibi also contends that the court violated her due process rights by imposing fines and fees without determining her ability to pay. Finding no error, we affirm.

## BACKGROUND

### A. *Prosecution Case*

The People charged appellant with Holman's murder (Pen. Code, § 187, subd. (a)) (count one), and with gross vehicular manslaughter while intoxicated (*id.*, § 191.5, subd. (a)) (count two).

3

### 1. Habibi's Drunk Driving

In 2011, in order to obtain her driver's license, Habibi took a written test that included questions about the risks of driving while intoxicated, and signed an application bearing the following advisement: "'I'm hereby advised that being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle.  Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both.  If I drive under the influence of alcohol or drugs or both, and as a result a person is killed, I can be charged with murder.'"

On November 24, 2017 (the day Holman was killed), around 2:00 p.m., Habibi texted her friends Tommy and Jonathan, proposing that they "'get drunk.'"[2]  Each friend made plans to see Habibi later that day.  Habibi also texted her friend Marissa, stating that she had not "'smoke[d] much'" that day, but was "'still a mess.'"  Habibi later told sheriff's deputies she smoked a bowl of marijuana around 6:00 or 6:30 p.m. on the day of the fatal collision.

After 7:00 p.m., Habibi drove to Tommy's house.  While there, she made plans to meet Jonathan at his home in Palmdale around 11:20 p.m.  Around 9:00 p.m., Habibi texted Marissa that she had "'killed the tequila'" and that she was "'buzzed.'"  Habibi continued, "'My heart's pounding.

---

[2]    Habibi's text messages were obtained pursuant to search warrants by Los Angeles County Sheriff's Department (LASD) Detective Ryan Bodily.

4

Like I want to take Xanax.  But I know I shouldn't because I'm drinking" -- adding that she would be "drinking and driving."  Marissa responded, "'Yeah that's a really bad idea.'"

Surveillance video from Schooners Patio Grille, a restaurant and bar in Lancaster, showed that Habibi drove Tommy to the bar around 9:30 p.m.  She and Tommy entered the bar with two friends.  The bar's owner testified that Habibi used a credit card to open a tab, and that her tab showed she ordered two "Adios Motherfucker" cocktails, the first at 9:36 p.m. and the second at 10:14 p.m.  Each Adios Motherfucker contained two ounces of hard liquor (a mixture of rum, vodka, gin, tequila, and triple sec).

While at the bar, Habibi exchanged texts with her ex-boyfriend Brant Harrington, informing him that she was drunk and "'hammered.'"  Harrington responded, "'Drink responsibly hahaha.'"  Habibi replied that she was drinking her "2nd Adios [Motherfucker],'" and soon reiterated that she was "'so drunk.'"  Habibi also sent Jonathan (the friend she had agreed to meet in Palmdale) a series of texts stating that she was drunk or "'really drunk,'" and asking, "'Okay where's the tequila?'"  At 10:14 p.m., Jonathan responded that he would see her later, and added, "'Don't get too drunk.'"  Habibi replied, "'I'm sk druk [*sic*].'"

Video from inside the bar showed Habibi taking a shot of liquor (presumably tequila) around 10:20 p.m.  Around 10:50 p.m., Habibi exited the bar without closing her tab or retrieving her credit card.  The video showed her entering

5

her car alone and driving out of the parking lot.  At 10:56 p.m., in reply to her message that she was "'sk druk [*sic*],'" Jonathan texted her, "'Geez haha I hope to god you are not driving tonight.'"

### 2. The Collision

The fatal collision occurred at 10:58 p.m., at the intersection of Avenue L and 10th Street West in Lancaster. The collision was captured on a nearby restaurant's surveillance video (which was played for the jury) and witnessed by Marva Lindsey and Troi Thomas.

Lindsey testified that shortly before the collision, while she was driving east on Avenue L, she prepared to cross two lanes in order to turn left at the 10th Street West intersection.  She was unable to cross, however, because she saw Habibi's car in the adjoining lane, racing toward the intersection at around 80 miles per hour (double Lindsey's speed).  Coming to a stop at the intersection, where the light was red, Lindsey saw Holman's car stopped in the same lane as Habibi's approaching car.  Thinking "Oh my god, this car isn't going to stop" and "Oh my god, oh my god, oh my god," she watched as Habibi's car "slammed" into Holman's, without braking.  The event data recorder recovered from Habibi's car corroborated Lindsey's testimony that Habibi's speed was around 80 miles per hour, and that Habibi did not brake.  The posted speed limit at the intersection was 50 miles per hour.

Thomas testified that he stopped at the intersection shortly before the collision, saw Habibi's car racing toward Holman's, and exclaimed to his passenger that her car was not going to stop. He watched as Habibi's car collided with Holman's, causing the latter to spin several times before coming to a stop in front of Thomas's car. Thomas rushed to the wrecked car and attempted to comfort Holman, who had tears coming down his cheeks, but was unresponsive.

Paramedics and firefighters extricated Holman from the wrecked car and transported him to a hospital, where he died several days later. A deputy medical examiner testified that he performed an autopsy and determined the cause of Holman's death to be blunt force injury to the head. He further testified that he listed the "manner" of death as "accident," pursuant to his office's practice of deeming any death accidental if it occurred in a vehicle collision.

### 3. Law Enforcement Investigation

LASD Deputy Jarrod Shiplett testified that slightly more than an hour after the collision, he asked Habibi, who had remained at the scene, if she needed medical attention. She responded, "'I'm so sorry. It's my fault. I'm drunk.'" Deputy Shiplett administered a series of field sobriety tests, on which Habibi generally performed poorly. With Habibi's consent, Deputy Shiplett twice administered a preliminary alcohol screening (breathalyzer) test, which indicated her blood-alcohol level was .132 or .119 percent. He arrested her and secured her consent to give a blood sample, which was

taken soon thereafter. A laboratory technician tested Habibi's blood sample and found a blood-alcohol level of .15 percent. Based on a hypothetical mirroring the facts of the case, a senior criminalist opined that at the time of the collision, Habibi's blood-alcohol level was between .15 and .20 percent.

About six hours after the collision, after advising Habibi of her *Miranda* rights, Detective Bodily conducted a videotaped interview of Habibi in her jail cell.[3] The video (which lacked audio) was played for the jury. Detective Bodily testified that he asked Habibi whether she knew it was dangerous to drive while intoxicated, and she told him "she did know, that her [ex-]boyfriend had gotten a DUI, so she knew because of the AA classes [he was required to take] and helping him get the . . . ignition interlock device for his vehicle."[4] He then asked whether she knew that intoxicated drivers could hurt or kill people, and she stated she did.

Two days later, after re-advising Habibi of her *Miranda* rights, Detective Bodily conducted another videotaped interview of Habibi. The video (recorded with audio) was played for the jury. Detective Bodily explained to Habibi that because the recording of their first interview

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[4]     Detective Bodily testified that an ignition interlock device functions like a breathalyzer connected to a car's ignition system, requiring alcohol-free breath samples at regular intervals in order to start the car and keep it running.

lacked audio, he wanted to confirm the accuracy of his report from the interview.  He reminded her, "I asked you if you understood the dangers [of drinking and driving] and you told me that . . . your ex-boyfriend had gotten a DUI and that, um, you were with him during the, uh, during his classes and everything and --"  Habibi interjected, "I would take him to AA, I helped him with the breathalyzer.  I tried to make him go to Community Service every day."  The detective continued, "I clarified at the end that you know DUI driving can cause people to be hurt and killed and you told me, 'yes.'"  Habibi did not directly respond, instead inquiring about Holman.

About a week after the collision, Habibi spoke by phone from her jail cell with Harrington (the ex-boyfriend she had been texting on the day of the collision).  The call was recorded and the recording played for the jury.  Habibi told Harrington, "I said I don't want you or Tommy to blame yourselves, this is -- this is my fucking stupid decision.  I'm the one who decided to chug the drink and get in the car."

### B. *Defense Case*

Habibi did not testify, but called two witnesses.  Harrington, her ex-boyfriend, testified that on the day of the collision, Habibi was displeased that he was seeing other women, and especially displeased that he brought another woman to Schooners around 10:19 p.m.  Habibi did not appear drunk to him during the five minutes he spent at Schooners.  On cross-examination, he testified that Habibi

9

drank an average amount for someone her age (22 at the time of the collision). He confirmed that about a month before the collision, Habibi texted him that she was drinking and wanted more wine or liquor, and he responded, "'You're not good to drive haha.'" She replied, "'Yes, I am. The wine is gone, but I've been munching and smoking.'" Later that day, she texted him, "'I haven't eaten. I've had an entire bottle of wine and I still want more liquor.'"

The other defense witness, the director of an education program for people convicted of DUI, testified that most of the program's students were initially ignorant of the fatal risks of driving while intoxicated, which they came to understand only through repetitive instruction over three or more months. Habibi had never enrolled in the program.

## C. *Jury Instructions and Closing Arguments*

The trial court instructed the jury on implied-malice murder (per CALJIC No. 8.31), as follows: "Murder of the second degree is the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an intentional act it is not necessary to prove that the defendant intended that the act would result in the

10

death of a human being."[5] The court also delivered pattern instructions on gross vehicular manslaughter while intoxicated (CALJIC No. 8.93), gross negligence (CALJIC No. 3.36), and causation (CALJIC No. 3.40).

In closing argument, the prosecutor argued that Habibi knew driving while intoxicated was dangerous to human life, relying on: (1) Habibi's admissions to Detective Bodily that she knew the danger; (2) Habibi's message to Marissa indicating that she knew mixing Xanax with alcohol would exacerbate the danger; (3) Harrington's text message telling Habibi to drink responsibly while she was at Schooners, along with their exchange about her drinking the month before; (4) Jonathan's message hoping Habibi was not driving (although the prosecutor acknowledged that Habibi was likely already driving when Jonathan sent this message); and (5) the "*Watson* advisement" in Habibi's signed driver's license application. The prosecutor argued that Habibi acted with conscious disregard for human life by choosing to drive drunk, rather than drinking less, getting a ride from one of her friends at Schooners, calling another friend or family member for a ride, calling a taxi or ride-

---

[5] Similarly, the court defined implied malice (per CALJIC No. 8.11), in relevant part, as follows: "Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

11

share service, or simply sleeping in her car until she was no longer drunk.

Habibi's counsel argued that she did not act negligently, let alone with implied malice. He argued that there was reasonable doubt whether Habibi was intoxicated at the time of the collision, suggesting she might have simply fallen asleep at the wheel. He further suggested that there was reasonable doubt whether Habibi knew driving while intoxicated was dangerous to human life, arguing that Habibi might not have read the *Watson* advisement, and that her admissions to Detective Bodily might have concerned her knowledge at the time of the interviews, after the collision and her arrest had apprised her of the danger.

In rebuttal, a second prosecutor noted that there was no evidence Habibi fell asleep or otherwise lost consciousness at the wheel. She again reviewed the evidence that Habibi knew driving while intoxicated was dangerous to human life, and added, "[T]his defendant hasn't lived under a rock, all right? There is talk about the dangers of driving [while intoxicated] all the time, everywhere."

### D. *Supplemental Instructions*

On several occasions, in response to requests from the jury during its deliberations, the court delivered supplemental instructions.

## 1. First Supplemental Instructions

On the first day of deliberations, the jury submitted the following request: "[CALJIC No.] 8.31 . . . [requires a finding that] [t]he act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. Can you explain conscious?" Before the court responded to this request, it received a note that Juror No. 8 had made eye contact with a relative who worked at the court, but had not interacted with her aside from making a "be quiet" gesture. The next morning, the court discussed Juror No. 8's note with counsel, but elected not to respond to it.

The court shared with counsel a proposed response to the jury's question about CALJIC No. 8.31. Habibi's counsel objected to the delivery of any additional instructions, but expressly stated he had "no particular objection" to the language of the court's proposed response. The court overruled the objection and delivered the following supplemental instructions: "The concept of implied malice has both a physical and a mental component. The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life. The mental component involves an act deliberately performed by a person, who knows that her conduct endangers the life of another, and who acts with conscious disregard for life. [¶] Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is

13

hurt or killed.'" As the court observed to counsel, its everyday-language definition of conscious disregard for life was quoted from *People v. Olivas* (1985) 172 Cal.App.3d 984, 987-988 (*Olivas*).[6]

## 2. Second Supplemental Instructions

Later, the jury submitted the following questions: "How can a person be guilty of gross vehicular manslaughter while intoxicated and 2nd degree murder? How can one count be w[ith] malice and the other count without malice?" The court read a proposed response to counsel. Defense counsel's "sole" objection was to the fourth paragraph of the proposed response. The court overruled the objection and delivered the following supplemental instructions:

> "Count 1 and Count 2 are not mutually exclusive. A defendant may be found 'guilty' or 'not guilty' of either or both crimes, based on the same evidence. [¶] A second degree murder conviction in Count 1 requires the People prove beyond a

---

[6] Mischaracterizing the record, Habibi asserts that the court delivered its first supplemental instructions on implied malice in response to Juror No. 8's note about seeing a relative, and argues that the instructions were an improper attempt to shift the jury's focus to implied malice. Not so. Although the instructions were delivered after receipt of Juror No. 8's note, they were delivered in response to the jury's earlier request for clarification of the meaning of "conscious" within CALJIC No. 8.31's definition of implied malice.

14

reasonable doubt that there was an unlawful killing, committed with implied malice, as defined in CALJICs 8.10-8.31, on page 7 of the instruction packet. [¶] A gross vehicular manslaughter while intoxicated conviction in Count 2 requires the People to prove beyond a reasonable doubt that the death of a human being was the result of certain acts committed with gross negligence, as defined in CALJICs 8.93 and 3.36, on page 8 of the instruction packet. [¶] There are two separate mental states required in Counts 1 and 2. A defendant may concurrently act with both of those mental states, or may act with one or the other, or neither, depending upon what you determine was proven by the evidence at trial."

### 3. Third Supplemental Instructions

Later still, the jury submitted the following request: "Please reconcile the 'everyday language' statement in the [first supplemental instructions] with the last sentence of juror instructions in [CALJIC No.] 8.31."[7] The court

---

[7] As noted, the first supplemental instructions included the following everyday-language definition of implied malice, quoted from *Olivas*: "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'" The last sentence of CALJIC No. 8.31 read, "When the killing is the direct result of such an intentional act it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

15

provided a proposed response to counsel, both of whom deemed the response acceptable. The court delivered the following supplemental instructions:

> "Here is how the instructions interplay/reconcile: [¶] In the theory of implied malice murder at issue here, the 'intentional act' alleged is driving under the influence of alcohol. [¶] Applying that premise to CALJIC 8.31, murder of the second degree under this theory requires: [¶] 1. The killing resulted from an intentional act (driving under the influence of alcohol); [¶] 2. The natural consequences of the act (driving under the influence of alcohol) are dangerous to human life, and [¶] 3. The act (driving under the influence of alcohol) was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an intentional act (driving under the influence of alcohol), it is not necessary that the People prove that the defendant intended that the act (driving under the influence of alcohol) would result in the death of a human being. Instead, the state of mind of a person who acts (by driving under the influence of alcohol) with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' [¶] A second degree murder conviction does not require an intent to kill. If you find that the defendant committed the act of driving under the influence of alcohol, and you find that the natural consequences of the act of driving under the

16

influence of alcohol are dangerous to human life, a second degree murder conviction also requires that the defendant had knowledge of, and consciously disregarded, the danger to human life when she acted by driving under the influence of alcohol."

### 4. Fourth Supplemental Instructions

After an ill juror was replaced by an alternate, the court instructed the jury to begin its deliberations anew and repeated its prior supplemental instructions. Later, the jury submitted the following request: "Court Reporter: please read back the testimony regarding the cause of death from the coroner, including why the death was ruled an accident."

The court provided counsel with a proposed response, the second paragraph of which referred the jury to and quoted the pattern instruction on causation (CALJIC No. 3.40). Defense counsel objected to this paragraph on the ground that it was not responsive to the jury's request. The court overruled the objection, explaining that the medical examiner's testimony had been "misleading to the jury" in characterizing Holman's death as an accident, and that further instruction was warranted to ensure the jury did not "impute the coroner's cause of death finding to a legal cause of death finding in this type of case."

The court delivered supplemental instructions advising the jury that the requested readback would be provided when available (as it eventually was), and stating, "In light of your request for readback of the coroner's 'cause of death'

17

finding, however, I also want to direct you to CALJIC 3.40, on page 8 of your instruction packet." The supplemental instructions proceeded to quote CALJIC No. 3.40, as follows: "The criminal law has its own particular way of defining cause. A cause of the death and/or bodily injury is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act death and/or bodily injury, and without which the death and/or bodily injury would not occur."

### 5. Final Supplemental Instructions

The jury's final questions were: "We would like to know what you meant by 'I know my conduct is dangerous to others but I don't care if someone is hurt or killed', what was the purpose of quoting that? Did you mean it literally or figuritivley [*sic*]?" The court read to counsel a proposed response. Habibi's counsel objected on the ground that the response was overly complex, and suggested simply quoting from *Olivas* again. The court adjourned for the day with an invitation to counsel to consider alternative responses. The next morning, the court provided counsel with the final version of its proposed response, which included two additional paragraphs. Habibi's counsel objected that one sentence within the response (beginning "'But, no'") lowered the prosecution's burden of proof. The court overruled the objection and delivered the following supplemental instructions:

18

"The court's purpose in providing you the previous answer was not to confuse you. I apologize if that was the effect that the answer had. Let me try to clear things up. [¶] The best definition for the mental state of implied malice appears in CALJICs 8.11 and 8.31. [¶] Oftentimes, jurors struggle with the difference between the mental states of implied malice (for second degree murder) and gross negligence (for gross vehicular manslaughter). [¶] The requisite culpability for vehicular manslaughter is gross negligence, which has been defined as the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [¶] On the other hand, malice may be implied when a person, knowing that her conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [¶] Though these definitions bear a general similarity, they are not identical. Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence. [¶] Different tests are applied in determining the required mental states of gross negligence or malice. A finding of gross negligence is made by applying an objective test: if a reasonable person in defendant's position would have been aware of the risk involved in the act of driving under the influence of alcohol, then the defendant is presumed to have had such an awareness. [¶] However, a finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved in the act of driving under the influence of

19

alcohol , i.e., a subjective standard. The court's earlier clarification was an attempt to explain this subjective state of mind in everyday language. [¶] But, no, the court did not mean to suggest that the People must prove that, prior to acting, the defendant literally said the words, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' Instead, the People must prove that, before she acted by driving under the influence of alcohol, the defendant herself knew that the act of driving under the influence of alcohol endangered the lives of others, and she chose to drive under the influence anyway. [¶] As CALJIC 8.11 explains, when it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought. Malice aforethought does not require any ill will or hatred of the person killed. The word 'aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act of driving under the influence of alcohol."

### E. *Verdicts and Sentencing*

Shortly after receiving the court's final supplemental instructions, the jury returned verdicts finding Habibi guilty of both counts. The court sentenced Habibi on the murder conviction to the high term of 15 years to life, commenting that in light of Habibi's knowledge of the dangers of drinking

and driving, her conduct throughout the day of the collision exhibited a "high degree of callousness" and presented a grave danger to society.  On her conviction for gross vehicular manslaughter while intoxicated, the court sentenced Habibi to a 10-year term, stayed under Penal Code section 654.  Without inquiring into Habibi's ability to pay, the court imposed $60 in criminal conviction assessment fees, $80 in court operations assessment fees, a $500 restitution fine, and a $500 parole revocation fine (stayed pending revocation of parole).  Habibi timely appealed.

## DISCUSSION
### A. *Sufficiency of the Evidence*
#### 1. **Principles**

A murder conviction requires a finding of malice, which may be implied.  (Pen. Code, §§ 187, 188.)  Implied malice has both a physical component and a mental component, the former requiring that the defendant perform """"an act, the natural consequences of which are dangerous to life,"""" and the latter requiring that the defendant """"knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.""""  (*People v. Soto* (2018) 4 Cal.5th 968, 974.)  Implied malice is similar to gross negligence in requiring an awareness of a risk of harm.  (*Watson*, *supra*, 30 Cal.3d at 294, 296.)  Implied malice differs from gross negligence in requiring awareness of a higher degree of risk, and in being analyzed under a

21

subjective standard, rather than a "reasonable person" standard. (*Id*. at 296-297.)

"Under certain circumstances, malice may be implied when a defendant kills someone while willfully driving under the influence of alcohol, thus subjecting the defendant to a charge of murder." (*Munoz, supra*, 31 Cal.App.5th at 152; see also *Watson, supra*, 30 Cal.3d at 300-301 ["'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard [for life]'"].) "Opinions affirming convictions under this principle have relied on a number of factors present in *Watson*, including "'(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.""" (*Munoz, supra,* at 152; accord, e.g., *People v. Autry* (1995) 37 Cal.App.4th 351, 358.) These factors are not requirements. (*Munoz*, at 152.)

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty

22

beyond a reasonable doubt.'"[8] (*People v. Morales* (2020) 10 Cal.5th 76, 88.) Presuming every fact in support of the judgment that the jury reasonably could have deduced from the evidence, we determine whether *any* rational jury could have found the crime's elements beyond a reasonable doubt. (*Ibid.*)

### 2. Analysis

Habibi's murder conviction was supported by substantial evidence of implied malice. On the basis of the evidence at trial, the jury reasonably could have found the following: Before the day of the fatal collision, Habibi knew of the life-threatening risks of driving while intoxicated because (1) in order to obtain her driver's license, she had been tested on her knowledge of the risks, and had signed an application advising her that driving while intoxicated is "extremely" dangerous to human life; (2) by her own admissions to Detective Bodily, she had learned of the risks in connection with her ex-boyfriend's punishment for a DUI conviction; and (3) about a month before the collision, Harrington had warned her she was "'not good to drive'" because she had been drinking. On the day of the collision,

---

[8] We reject Habibi's suggestion, unsupported by any citation to authority, that a challenge to the sufficiency of the evidence of *Watson* murder requires "extra-meticulous appellate scrutiny." We have expressly applied "the usual standard of the substantial evidence rule" to such a challenge. (*People v. Autry*, *supra*, 37 Cal.App.4th at 358-359.)

after smoking marijuana at her home, and with an express understanding that taking Xanax would exacerbate the risks of her plan to drink and drive, Habibi "'killed'" tequila at Tommy's house until she was "'buzzed,'" then drove to Schooners. There, in the face of Harrington's and Jonathan's admonitions to "'Drink responsibly'" and "'Don't get too drunk,'" she drank a shot of tequila and two potent cocktails, planning to thereafter drive to Jonathan's home. She chose to drive to his home while "'hammered,'" as established by her statements before and soon after the collision, which were corroborated by chemical tests and expert opinion testimony indicating her blood-alcohol level was around .15 percent -- nearly twice the legal limit -- at the time of the collision. Finally, she drove in a highly dangerous manner, attempting to race through a red light at some 80 miles per hour (30 miles above the posted speed limit), in the presence of three other drivers -- including Holman, stopped in her lane. (See *People v. Hicks* (2017) 4 Cal.5th 203, 215 ["[defendant] drove at 80 miles per hour through a red light in a densely populated urban area during the weekday rush hour. Doing so can be likened to shooting a gun into a crowd; it is manifestly an act dangerous to human life"]; *Watson*, *supra*, 30 Cal.3d at 301 ["Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death"].)

In reliance on these findings, the jury reasonably could have concluded that Habibi acted with knowledge of, and conscious disregard for, the danger to human life posed by

24

her drunk driving.  Indeed, these findings establish all four factors that appellate courts have identified as support for a *Watson* murder conviction.  (See *Munoz, supra,* 31 Cal.App.5th at 152 [factors are blood-alcohol level above .08 percent, predrinking intent to drive, knowledge of danger of driving while intoxicated, and highly dangerous driving].)

In disputing the sufficiency of the evidence that she knew drunk driving was dangerous to human life, Habibi disregards the standard of review, which requires us to presume that the jury drew all reasonable inferences in support of the judgment.  (See *People v. Morales, supra,* 10 Cal.5th at 88.)  For instance, Habibi argues that the People failed to prove she read or understood the *Watson* advisement in her driver's license application.  But her signature on the application reasonably supported an inference that she read the advisement, which was stated in plain language.[9]  (See *People v. Collins* (2021) 60 Cal.App.5th 540, 556, fn. 16 ["Collins further argues 'the truth is that people do not read the reverse sides of [driver's license] applications, any more than people read the 'terms and

_____

[9]    We reject Habibi's suggestion that because she was 16 years old when she applied for her driver's license, due process prohibited the jury from relying on an inference that she read and understood the *Watson* advisement.  The cases she cites in support of this suggestion are inapposite, as they concern sentencing juveniles to death or life imprisonment.  (See *Miller v. Alabama* (2012) 567 U.S. 460, 465; *Graham v. Florida* (2010) 560 U.S. 48, 52; *Roper v. Simmons* (2005) 543 U.S. 551, 555.)

conditions' of car rental agreements.'  But his signature undoubtedly *is* evidence he read the [*Watson*] warnings and it is the jury's exclusive prerogative to resolve the facts"].)  Similarly, while Habibi argues that the People failed to prove she learned anything about drunk driving in connection with her ex-boyfriend's DUI conviction, the jury reasonably could infer that she did, given her admissions to Detective Bodily that she knew the life-threatening risks of drunk driving *because of* her ex-boyfriend's DUI conviction.  Finally, Habibi argues that by acknowledging to Marissa that she should not take Xanax because she planned to drink and drive, she demonstrated that she believed she could safely drink and drive so long as she did not take Xanax.  But the jury reasonably could have interpreted Habibi's message to Marissa as reflecting knowledge that Xanax would *exacerbate* the life-threatening risks of drunk driving.  (See *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 ["Given the highly deferential [substantial evidence] standard of review, we cannot second-guess any reasonable interpretations of the evidence by the jury"].)

Habibi erroneously suggests that the sufficiency of the evidence of implied malice must be analyzed without reference to her specific conduct, citing *People v. Howard* (2005) 34 Cal.4th 1129 (*Howard*), a felony murder case, for the proposition that the dangerousness of a defendant's conduct must be assessed in the abstract.  In so doing, Habibi "attempts to borrow from the analysis applicable to felony murder in order to escape the applicability of the

principles involved in the concept of implied malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107.) "Where the felony-murder rule is applicable, a court looks to the underlying felony in the abstract in order to determine whether the underlying felony was so inherently dangerous that malice can be ascribed to the defendant without reference to the particular facts of the case." (*Id.* at 106.) "In contrast, a murder committed with implied malice requires that the prosecution demonstrate the defendant in fact acted with malice," necessarily requiring consideration of the defendant's specific acts and the context in which they were committed. (*Id.* at 106-107.) Thus, despite holding in *Howard* that a certain felony (driving with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer) was not inherently dangerous in the abstract, and therefore could not support a motorist's murder conviction under a felony-murder theory, our Supreme Court noted that "[a] jury may well find that the motorist has acted with malice by driving with conscious disregard for the lives of others, and thus is guilty of [implied-malice] murder." (*Howard*, *supra*, 34 Cal.4th at 1132, 1138-1139, citing *Watson*, *supra*, 30 Cal.3d 290.)

Citing several *Watson* murder cases in which the defendants were warned of the dangerous nature of their driving by pre-collision events (such as near-collisions and protests from frightened passengers), Habibi observes that unlike those defendants, she drove "without incident" before the collision. But on this record, no pre-collision incident

27

was required to establish that Habibi knew of and consciously disregarded the dangers posed by her drunk driving.  (See, e.g., *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1090-1091 ["Appellant relies on *Watson* and other cases in which the defendant's prior DUI conviction or a near miss with other vehicles established the 'accused's awareness of the life threatening risks of drunk driving.'  [Citations.]  [¶] We hold that there is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice"].)  In sum, Habibi's murder conviction was supported by substantial evidence of implied malice.

### B. *Supplemental Jury Instructions*

"After the jur[ors] have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given . . . ."  (Pen. Code, § 1138.)  "[S]ection 1138 only declares the right of the jurors to demand to be reconducted into court; it is not a limitation upon the power of the court.  The court possesses an inherent power to cause the jury to be returned for further instructions, a power wisely employed whenever the judge becomes convinced that he has not made them fully to understand an appropriate proposition of law . . . ."  (*People v. Perry* (1884) 65 Cal. 568,

569; see also 6 Witkin and Epstein, Cal. Criminal Law (4th ed. 2021) § 10.)

Here, in response to requests from the jury while it was deliberating, the trial court delivered several sets of supplemental instructions. Habibi contends that the court prejudicially erred in delivering various portions of its supplemental instructions, each of which allegedly (1) misled the jury with respect to the law of implied malice, or (2) infringed on the jury's functions. We disagree.

### 1. Law of Implied Malice

Habibi argues that the court misstated the law of implied malice by instructing the jury that "[a] defendant may be found 'guilty' or 'not guilty' of either or both [murder and gross vehicular manslaughter while intoxicated], based on the same evidence," allegedly "allow[ing] the jury to find Habibi guilty of second-degree murder without finding she acted with implied malice." Habibi further argues that the court misled the jury with respect to the law of implied malice through its "confusing" instruction (quoted from *Olivas, supra,* 172 Cal.App.3d 984) that "[p]hrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'"

Habibi forfeited her objections to these portions of the court's supplemental instructions by failing to object in the trial court. When the court delivered the *Olivas* definition of

29

implied malice in its first supplemental instructions, Habibi's counsel expressly stated he had "no particular objection" to the court's language.  When the court delivered its second supplemental instructions, including the "same evidence" instruction to which Habibi objects on appeal, her trial counsel objected only to an unrelated paragraph. Finally, when the court again delivered the *Olivas* definition in its third supplemental instructions, Habibi's counsel affirmatively deemed the instructions acceptable.  Thus, Habibi forfeited her objections on appeal.  (See *People v. Dykes* (2009) 46 Cal.4th 731, 802 ["defendant's claim [of error in the trial court's response to a jury question] is forfeited on appeal, because defendant did not object or request clarification at trial; he instead agreed with the court's formulation"]; cf. *People v. Roldan* (2005) 35 Cal.4th 646, 729 ["When a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138"], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390.)

In any event, we find no merit in Habibi's objections. The court's "same evidence" instruction did not state or imply that the jury could convict Habibi of murder without finding malice.  On the contrary, the court reminded the jury that murder, unlike gross vehicular manslaughter while intoxicated, required malice.  The jury's questions suggested a misunderstanding that gross vehicular manslaughter while intoxicated required a finding that Habibi acted "without malice," and that a conviction for that offense

30

would therefore be inconsistent with an implied-malice murder conviction. The court properly clarified that the offenses were "not mutually exclusive" by reminding the jury that the same evidence might establish both offenses' similar mental components. (Cf. *Watson*, *supra*, 30 Cal.3d at 294 ["'gross negligence' and 'implied malice' are similar in requiring an awareness of a risk of harm"].)

Further, the court did not err in using the *Olivas* definition of implied malice. The *Olivas* definition is a correct statement of law; indeed, appellate courts continue to quote it with approval. (See *People v. Tseng* (2018) 30 Cal.App.5th 117, 129; *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358; *People v. Johnigan*, *supra*, 196 Cal.App.4th at 1092.) Although the jury eventually requested clarification of the *Olivas* definition, Habibi has not shown that this request reflected instructional error, rather than the subtlety of the distinction between implied malice and gross negligence in the drunk-driving context. (Cf. *Olivas*, *supra*, 172 Cal.App.3d at 989 [describing this distinction as "so subtle that it could easily be lost in application"].) Nor has Habibi asserted any error in the court's final supplemental instructions, delivered in response to this request for clarification. In sum, Habibi fails to show that the court misled the jury with respect to the law of implied malice.

## 2. Jury Functions

Habibi argues that the court infringed on the jury's factfinding function by delivering the following instructions: "In the theory of implied malice murder at issue here, the 'intentional act' alleged is driving under the influence of alcohol. [¶] Applying that premise to CALJIC 8.31, murder of the second degree under this theory requires: [¶] 1. The killing resulted from an intentional act (driving under the influence of alcohol); [¶] 2. The natural consequences of the act (driving under the influence of alcohol) are dangerous to human life, and [¶] 3. The act (driving under the influence of alcohol) was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." Habibi further argues that the court infringed on the jury's deliberating function by delivering supplemental instructions on causation "when none were solicited by the jury."

We reject Habibi's challenge to the court's instructions relating the elements of murder (as set forth in CALJIC No. 8.31) to the theory of *Watson* murder. Habibi forfeited this challenge by failing to object in the trial court; indeed, her trial counsel affirmatively acquiesced in these instructions. (See *People v. Dykes*, *supra*, 46 Cal.4th at 802.) In any event, the instructions did not infringe on the jury's factfinding function. They were merely pinpoint instructions explaining the theory of *Watson* murder in general terms. They were not argumentative, as they did not refer to any specific evidence or suggest any conclusions; instead, they referred

32

only to the "premise" underlying the "theory" of murder at issue, and they recognized that it was for the jury to find whether the elements of murder had been satisfied. We discern no error. (Cf. *People v. Souza* (2012) 54 Cal.4th 90, 120-121, 138-139 [trial court did not err in delivering two pinpoint instructions requested by prosecutor]; *People v. Carter* (1993) 19 Cal.App.4th 1236, 1253, fn. 11 ["So long as the instruction is otherwise proper, no right of the defendant is infringed by allowing the prosecutor to request an instruction which focuses a jury on factors which are relevant to its determination of the issues for decision"].)

Likewise, we discern no error in the court's delivery, on its own motion, of supplemental instructions on causation. Contrary to Habibi's assertion that "[i]t is the jury's role -- not the court's -- to decide when further instruction is needed," the jury and the court share this role. Although the jury has a statutory power to request further instruction, the statute does not limit the court's inherent power to deliver such instruction on its own motion, which is "wisely employed whenever the judge becomes convinced that he has not made [the jury] fully to understand an appropriate proposition of law." (*People v. Perry, supra*, 65 Cal. at 569.) Habibi does not challenge the court's finding, based on the jury's request for readback of the medical examiner's testimony characterizing Holman's death as an accident, that its prior instructions had failed to ensure the jury fully understood the relevant law on causation. Moreover, even had we found error, we would find no prejudice. The court's

supplemental instructions on causation merely referred the jury to, and quoted, the pattern instruction on causation (CALJIC No. 3.40). The pattern instruction was a correct statement of law on an issue that was not in dispute, viz., whether Habibi's conduct caused Holman's death.

In sum, Habibi fails to show any error in the court's supplemental instructions. Having rejected her claims of instructional error, we likewise reject her contention that she was prejudiced by the cumulative effect of the asserted errors.

### C. *Fines and Fees*

Relying on *Dueñas*, *supra*, 30 Cal.App.5th 1157, Habibi contends that the trial court violated her due process rights by imposing fines and fees without determining her ability to pay. Acknowledging that *Dueñas* was decided well in advance of her sentencing hearing, and that her trial counsel nevertheless failed to raise a *Dueñas* objection, Habibi argues that her objection was preserved for appeal because it presents a pure question of law. In the alternative, she argues that her counsel was unconstitutionally ineffective for failing to object. Where, as here, the record is silent regarding counsel's reasons for a challenged omission, a defendant claiming ineffective assistance must show that there is no conceivable tactical reason for the omission. (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

As we have previously explained, we agree with our colleagues in Division Eight that a failure to object in the

34

trial court forfeits a *Dueñas* claim on appeal. (*People v. Washington* (2021) 61 Cal.App.5th 776, 800, citing *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155.) Habibi identifies no persuasive reason to depart from our precedent. Thus, we conclude that Habibi forfeited her *Dueñas* claim.

For a different reason, we conclude that Habibi forfeited her related ineffective assistance claim. "'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793; accord, *People v. Guzman* (2019) 8 Cal.5th 673, 683, fn. 7 [appellant forfeited due process claim by failing to "develop the argument"].) Here, Habibi's argument in support of her ineffective assistance claim is limited to a quotation concerning sentencing error from *People v. Scott* (1994) 9 Cal.4th 331, 351 (*Scott*), which did not address an ineffective assistance claim, let alone such a claim concerning a failure to raise a *Dueñas* objection.[10] Habibi

---

[10] *Scott* held that "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Scott*, *supra*, 9 Cal.4th at 356.) To the extent *Scott* mentioned ineffective assistance claims, it discouraged them as a method of circumventing the forfeiture rule, observing that they are governed by "stringent" standards, and that "by encouraging counsel to intervene at the time sentencing choices are made, we hope to reduce the number of issues raised in the reviewing court *(Fn. is continued on the next page.)*

35

fails to argue that there is no conceivable reason for her counsel's omission, or to reply to the People's argument that the omission might have been a reasonable tactical decision in light of evidence that Habibi had the ability to pay the fines and fees.[11] We conclude that Habibi forfeited her ineffective assistance claim by failing to develop an argument with citation to relevant authority. (See *People v. Guzman* (2019) 8 Cal.5th at 683, fn. 7; *People v. Stanley*, *supra*, 10 Cal.4th at 793.)

---

in *any* form." (*Id.* at 356, fn. 18.) *Scott* therefore undermines Habibi's perfunctory ineffective assistance claim.

[11]    There is nothing in the record to suggest Habibi would be unable to pay the $640 in non-stayed fines and fees, either with her own funds, assistance from her family, or prison wages. (Cf. *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060-1061 ["it is clear [defendants] can make payments from either prison wages or monetary gifts from family and friends during their lengthy prison sentences. [Citation.] Thus, even assuming a constitutional violation occurred, any alleged error is harmless beyond a reasonable doubt"].) Habibi was employed prior to her arrest, utilized retained counsel throughout the proceedings, and was presumably capable of earning prison wages.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



MANELLA, P. J.



We concur:



WILLHITE, J.



COLLINS, J.